[No. B042986. Second Dist., Div. Four. May 3, 1991.]

LOS ANGELES NATIONAL BANK, Plaintiff and Appellant, v. BANK OF CANTON OF CALIFORNIA, Defendant and Respondent.

COUNSEL

Suzuki & Ito and Ronald N. Ito for Plaintiff and Appellant.

Kaplan, Russin & Vecchi, Mattaniah Eytan, Daniel H. Qualls and Jonathan J. Uchima for Defendant and Respondent.

OPINION

**GEORGE, Acting P. J.**—Appellant Los Angeles National Bank filed an action against respondent Bank of Canton of California seeking $2,257,965 in compensatory damages, plus punitive damages, for respondent's alleged failure either to pay the face amount of, or notify appellant it would not honor, 28 checks prior to the "midnight deadline" established by the California Uniform Commercial Code,[1] and for conversion arising from respondent's alleged wrongful failure to pay appellant the face amount of the checks. The superior court denied a motion brought by appellant for summary judgment, instead granting a motion brought by respondent for summary judgment on the basis that the evidence was undisputed that appellant's loss resulted from the negligence of its employees rather than from respondent's failure to return the checks prior to the statutory deadline. The superior court denied respondent's claim that, as the prevailing party, it was entitled to attorney's fees pursuant to Civil Code section 1717.

Appellant contends the superior court erred in (1) granting summary judgment, because respondent is liable for the total face amount of checks it returned after the applicable midnight deadlines; and (2) denying appellant's motion for summary judgment or summary adjudication of issues brought on the ground that respondent is liable as a matter of law for the checks it returned after the midnight deadline.[2] Respondent also appeals, contending the superior court erred in denying its application for attorney's fees. For the reasons that follow, we reverse the summary judgment granted in favor of respondent and therefore do not reach the issue of attorney's fees.

FACTUAL AND PROCEDURAL HISTORY

On September 26, 1986, appellant filed a complaint against respondent, alleging that respondent failed to timely notify appellant it would dishonor

---

[1] All further statutory references are to the California Uniform Commercial Code unless otherwise indicated.

[2] An order denying a motion for summary judgment is a nonappealable order. (*Stanton* v. *Andrews* (1959) 170 Cal.App.2d 269, 270-271 [338 P.2d 529]; 9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 87, p. 108.)

28 checks having a total face value of $2,257,965 and that therefore, pursuant to the Commercial Code and federal banking regulations, respondent was liable to appellant for the face amount of the checks.

It is undisputed that appellant and respondent both use the Los Angeles branch of the Federal Reserve Bank of San Francisco as an intermediary "clearinghouse" to settle accounts for negotiable items which pass between appellant and respondent. In addition, respondent had entered into an agreement with the Federal Reserve Bank requiring the latter to send checks and other items to Decimus Corporation, an entity located outside the premises of respondent and employed by the latter to sort, collate, and otherwise process checks and various items for respondent. In a typical transaction, the U.S. Courier Corporation, a messenger service, would pick up items from the Federal Reserve Bank and deliver them to Decimus Corporation, where they would be processed before delivery to respondent. It was the responsibility of respondent to determine whether to return an item for insufficient funds.

In August or September of 1985, an entity known as Golden Fields Leasing Company, Inc., established a checking account with respondent, purportedly for use in a business consisting of selling and leasing Mercedes Benz automobiles. During the period from January 22 to January 25, 1986, Tony Lam and Peter Wong, principals in the business, executed 28 checks drawn on Golden Fields Leasing Company, Inc.'s account with respondent. These individuals deposited the checks, in three separate groups, in an account held by Golden Fields Leasing Company, Inc., in one of appellant's branch offices in Monterey Park, located three blocks from one of respondent's branch offices.

It was alleged in appellant's complaint that on January 22, 1986, a Wednesday, appellant processed three checks totalling $900,000, drawn by Golden Fields Leasing Company, Inc., on its account with respondent. Appellant sent the three checks for collection to the Federal Reserve Bank, which provisionally "settled" and delivered the checks to respondent before 2 p.m. on Friday, January 24th. Respondent, on the basis there were insufficient funds in the account of Golden Fields Leasing Company, Inc., returned the checks to appellant on Tuesday, January 28th, after expiration of the statutory "midnight deadline" for returning the items, which must be met in order to revoke the provisional settlement made by the Federal Reserve Bank. Appellant alleged that, after it subsequently returned each of the checks to respondent marked "Late Return Item Claim, Response," respondent again returned the checks, marking them "Paying Bank's Response To Late Return Item Claim," thus wrongfully denying that the checks were returned late and that appellant was due the face amount of the

checks. In a separate cause of action, appellant alleged that respondent wrongfully had converted to its own use the face amount of these checks.

Appellant made similar allegations regarding a second group of 17 checks totalling $1,091,520 processed by appellant on Friday, January 24, 1986, which the Federal Reserve Bank provisionally settled and delivered to respondent before 2 p.m. on Monday, January 27th. It was alleged respondent returned these checks for insufficient funds on or after Wednesday, January 29th, after expiration of the midnight deadline. Appellant alleged a separate cause of action for conversion of the total face amount of this group of checks.

Appellant made similar allegations regarding a third group of eight checks totalling $266,445, which it had processed on Monday, January 27, 1986, and which the Federal Reserve Bank provisionally settled and delivered to respondent before 2 p.m. on Tuesday, January 28th. It was alleged respondent returned these checks for insufficient funds on or after Thursday, January 30th, after expiration of the midnight deadline. Appellant alleged a separate cause of action for conversion of the total face amount of this group of checks.

Appellant moved for summary judgment on the ground respondent was accountable for the face amount of the checks because it had failed to return the checks before the midnight deadline in accordance with the applicable provisions of the Commercial Code. Respondent in turn moved for summary judgment on the basis that appellant's loss was caused solely by the negligence of its employees in cashing the checks or giving credit to the principals of Golden Fields Leasing Company, Inc., without verifying that there were funds on deposit with respondent sufficient to pay the face amount of the checks.

In support of its motion for summary judgment, respondent submitted the following evidence. On January 22 and 23, 1986, the principals of Golden Fields Leasing Company, Inc., deposited with appellant three checks totalling $900,000. After appellant had transferred them to the Federal Reserve Bank, at 6 p.m. on Friday, January 24th, U.S. Courier Corporation picked up the first group of three checks from the Federal Reserve Bank and delivered them to Decimus Corporation. After processing by Decimus Corporation, respondent received this group of checks on Tuesday, January 28th, and returned them to the Federal Reserve Bank that day. Between 8:57 and 9:05 a.m. that day, respondent informed the Federal Reserve Bank by telephone that it would not honor the checks. The Federal Reserve Bank wired notice to that effect to appellant later that day.

On Friday, January 24th, the principals of Golden Fields Leasing Company, Inc., deposited with appellant 17 checks totalling $1,091,520. At 6 p.m. on Monday, January 27th, U.S. Courier Corporation picked up the second group of 17 checks from the Federal Reserve Bank and delivered them to Decimus Corporation. On Wednesday, January 29th, respondent received these checks and returned them to the Federal Reserve Bank that day. Between 3:28 and 3:38 p.m. that day, respondent informed the Federal Reserve Bank by telephone that it would not honor the checks. The Federal Reserve Bank wired notice to that effect to appellant on January 30th.

On Saturday, January 25th, the principals of Golden Fields Leasing Company, Inc., deposited with appellant eight checks totalling $266,445. At 6 p.m. on Tuesday, January 28th, U.S. Courier Corporation picked up the third group of eight checks from the Federal Reserve Bank and delivered them to Decimus Corporation. On Thursday, January 30th, respondent received these checks, returning them to the Federal Reserve Bank that same day. Later that day, respondent informed the Federal Reserve Bank by telephone that it would not honor the checks, and the Federal Reserve Bank wired notice to that effect to appellant.

Respondent's evidence established that U.S. Courier Corporation typically picked up items from the Federal Reserve Bank and delivered them to Decimus Corporation on the same evening. These items would be processed during the following day, and on the third day Decimus Corporation would send them by courier to respondent.

Respondent furnished the following additional evidence. Ms. Pou San Au was an operations officer who worked for appellant at its branch office in Monterey Park. On Thursday, January 23, 1986, after Lam and Wong had deposited three checks totalling $900,000, Ms. Pou San Au gave Lam and Wong $400,000 in cash, in violation of the limitations placed on her authority to give immediate credit. The two men carried the cash out of the bank in brown paper bags. On the same day, other employees of appellant wire-transferred $488,000 in credit against the remaining uncashed checks to National Westminster Bank in New York. On Friday, January 24th, Lam and Wong deposited 17 checks payable to appellant, exchanging 15 of these for cashier's checks payable to the Bank of America. They also received $400,000 in cash from Ms. Pou San Au, which the two men carried from the bank in brown paper bags. On Saturday, January 25th, Lam and Wong deposited eight checks payable to appellant, immediately exchanging them for cashier's checks payable to the Bank of America.

On Monday, January 27th, Ms. Pou San Au walked the three blocks from the bank where she worked to the branch office of respondent, where

she inquired of respondent's employees to verify that adequate funds were available in the checking account of Golden Fields Leasing Company, Inc., to cover the checks she had cashed. Ms. Pou San Au was advised by respondent's employees that the account of Golden Fields Leasing Company, Inc., lacked adequate funds, and that respondent would return, without honoring, any checks written on that account, with the designation "uncollected funds."

Ms. Pou San Au, immediately returning to appellant's branch office, notified the branch manager, Kevin Chan, and appellant's president of the loss and was thereupon suspended. (Subsequently, she was terminated for cause because of having granted immediate credit to Lam and Wong without first verifying whether the account of Golden Fields Leasing Company, Inc., had adequate funds to cover the amount of the checks which its principals had presented.) Mr. Chan went to the offices of Golden Fields Leasing Company, Inc., and found them deserted and wiped clean of fingerprints. On that date, appellant notified the Federal Bureau of Investigation of appellant's loss.

In opposition to respondent's motion for summary judgment, and incorporating evidence introduced in support of its own motion for summary judgment, appellant established that the first group of checks was made available for pickup and was received by Decimus Corporation on January 24, 1986, but that respondent did not return the checks, with written notice they were dishonored, until January 28th. The second group of checks was made available for pickup and was received by Decimus Corporation on January 27th, but respondent did not return the checks until January 29th. The third group of checks was made available for pickup and was received by Decimus Corporation on January 28th, but respondent did not return the checks until January 30th. As to each group of checks, appellant provided evidence, in the form of expert and other testimony, that the Federal Reserve Bank made the checks available for pickup by Decimus Corporation before 2 p.m. on the dates in question, thereby effectuating presentation and delivery at that time.

Appellant also provided detailed information concerning its extensive prior dealings with Lam and Wong over the four- to five-month period preceding the incidents involved in the present case, demonstrating that Ms. Pou San Au had handled numerous other items for Lam without incident. A number of the checks deposited during the three-day period were accepted in payment for "automobile drafts" and documents of title related to Golden Fields Leasing Company, Inc.'s business, rather than for cash. Ms. Pou San Au did not violate her credit authorization in cashing or allowing credit for at least some of the checks. When Ms. Pou San Au contacted

respondent on January 27, 1986, it did not inform her that any further checks it received would be returned unpaid. The FBI was notified only on January 28, 1986, that there was a possible loss.

Additionally, appellant submitted evidence that on January 15, 1986, respondent had become suspicious of the activities of Golden Fields Leasing Company, Inc., and as of January 17th, began to scrutinize its account, instructing its tellers to hold all checks on this account. On January 23d and 24th, respondent's employees contacted appellant's employees to verify cashier's checks drawn on Golden Fields Leasing Company, Inc.'s account with appellant. Nonetheless, respondent failed to notify appellant, any other bank, or any regulatory agencies of its suspicions.

The superior court denied appellant's motion for summary judgment, granted respondent's motion for summary judgment, and entered judgment in favor of respondent. Appellant filed a notice of appeal from the order granting summary judgment.[3]

## DISCUSSION

### THE SUPERIOR COURT ERRED IN GRANTING THE MOTION FOR SUMMARY JUDGMENT

Code of Civil Procedure section 437c, subdivision (c), provides: "The motion for summary judgment shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." ■ Summary judgment is proper only when there is no issue of material fact to be tried. (*Steingart* v. *White* (1988) 198 Cal.App.3d 406, 411 [243 Cal.Rptr. 678].) "In order to prevent the imposition of a summary judgment, the disputed facts must be 'material,' i.e., relate to a claim or defense in issue which could make a difference in the outcome. [Citation.] We recognize that summary judgment procedures are viewed as 'drastic' [citations]; however, the purpose of a summary judgment 'is to expedite litigation by avoiding needless trials' [citation]." (*Burton* v. *Security Pacific Nat. Bank* (1988) 197 Cal.App.3d 972, 976-977 [243 Cal.Rptr. 277].)

" ' "The moving party bears the burden of furnishing supporting documents that establish that the claims of the adverse party are entirely without merit on any legal theory." . . . [Citation.]' " (*Steingart* v. *White, supra*, 198

---

[3] Such an order is not appealable. We treat the premature appeal, however, as an appeal from the subsequently entered judgment. (*Morales* v. *Coastside Scavenger Co.* (1985) 167 Cal.App.3d 731, 733, fn. 1 [213 Cal.Rptr. 482]; Cal. Rules of Court, rule 2(c).)

Cal.App.3d 406, 411.) The declarations of the moving party are strictly construed and those of the nonmoving party liberally construed, " 'and doubts as to the propriety of granting the motion should be resolved in favor of the party opposing the motion.' " (*Sheffield* v. *Eli Lilly & Co.* (1983) 144 Cal.App.3d 583, 611 [192 Cal.Rptr. 870]; *Becker* v. *IRM Corp.* (1985) 38 Cal.3d 454, 458 [213 Cal.Rptr. 213, 698 P.2d 116, 48 A.L.R.4th 601].) ■ The reviewing court must conduct an examination de novo "to determine whether there are any genuine issues of material fact or whether the moving party is entitled to summary judgment as a matter of law. [Citation.]" (*Onciano* v. *Golden Palace Restaurant, Inc.* (1990) 219 Cal.App.3d 385, 391 [268 Cal.Rptr. 96].)

■ Appellant contends that the superior court erred in granting summary judgment because respondent is strictly liable for the amounts of the checks it returned after expiration of the midnight deadline.

Pursuant to the California Uniform Commercial Code, appellant acted as the "depositary bank" in the course of these transactions, defined as "the first bank to which an item is transferred for collection even though it is also the payor bank." (§ 4105, subd. (a).) After a check is deposited with a depositary bank, it is sent to an "intermediary bank," defined as "any bank to which an item is transferred in course of collection except the depositary or payor bank" (§ 4105, subd. (c)) (in this case the Federal Reserve Bank), which either delivers the check or makes it available for pickup by the "payor bank" (in this case respondent), defined as "a bank by which an item is payable as drawn or accepted" (§ 4105, subd. (b)). Each bank in the collection process "settles" for the check, that is, it pays the amount for which the check is written in cash, in a charge or credit, or by remittance. The settlement may be provisional or final. (§ 4104, subd. (1)(j).) An intermediary bank, such as the Federal Reserve Bank, makes only a provisional settlement of the check.

The check ultimately is presented to the payor bank, here, respondent. "Presentment" is defined as "a demand for acceptance or payment made upon the maker, acceptor, drawee or other payor by or on behalf of the holder." (§ 3504, subd. (1).) The payor bank makes a provisional settlement with the "presenting bank," defined as "any bank presenting an item except a payor bank" (§ 4105, subd. (e)) (here the Federal Reserve Bank). The payor bank may then provide final settlement by paying the item in cash, by settling without a right to revoke the settlement, or by settling with a right to revoke the settlement but subsequently failing to exercise the right to revoke in the time and manner permitted by such right. (§ 4213, subd. (1).) Pursuant to sections 4104, subdivision (1)(h), and 4301, subdivision (1), the payor bank may revoke a provisional settlement and recover any payment

made to the intermediary bank before midnight on the day following the banking day on which it receives the check, by either returning the check or sending written notice that the check will not be honored. A banking day ends at 2 p.m., and receipt of an item after 2 p.m. is deemed to constitute receipt on the following banking day. (§ 4104, subd. (1)(c); § 4107, subds. (1) and (2).)

Section 4302 provides: "In the absence of a valid defense such as breach of a presentment warranty (subdivision (1) of Section 4207), settlement effected or the like, if an item is presented on and received by a payor bank the bank is accountable for the amount of [¶](a) A demand item other than a documentary draft *whether properly payable or not* if the bank, in any case where it is not also the depositary bank, retains the item beyond midnight of the banking day of receipt without settling for it or, regardless of whether it is also the depositary bank, does not pay or return the item or send notice of dishonor until after its midnight deadline. . . ." (Italics added.)[4]

In *Bank of America* v. *Security Pacific Nat. Bank* (1972) 23 Cal.App.3d 638 [100 Cal.Rptr. 438], which decided that an action based on the statutory liability created by section 4302 was time-barred, the court stated: "We have been unable to find any California case delineating the scope of Commercial Code section 4302. Several cases from other jurisdictions have construed identical language contained in the Uniform Commercial Code to provide a basis for a statutory cause of action for the amount of the demand item involved [citations]. Those courts have construed the word 'accountable' contained in section 4302 to be synonymous with 'liable' and have imposed liability on the payor bank for the amount of the item for a delay in returning the item beyond the bank's midnight deadline." (23 Cal.App.3d at pp. 642-643.) "We agree with the reasoning of the above authorities and hold that section 4302 creates *a liability independent of negligence* (see Com. Code, § 4103, subd. (5)) *or conversion* (Com. Code, § 3419) for the amount of the item involved. In arriving at this conclusion we are mindful

---

[4] A check is a "draft drawn on a bank and made payable on demand. (Com. Code, § 3104, subd. (2)(b).) A draft is an order to pay a sum certain in money, signed by the drawer, payable on demand or at a definite time, and to order or bearer. (Com. Code, § 3104, subds. (1) and (2)(a)." (*People* v. *Norwood* (1972) 26 Cal.App.3d 148, 154 [103 Cal.Rptr. 7].)

The "midnight deadline" is defined as midnight on the bank's "next banking day following the banking day on which it receives the relevant item or notice or from which the time for taking action commences to run, whichever is later." (§ 4104, subd. (1)(h).)

The Federal Reserve Bank regulations (12 C.F.R. § 210.12(a)) pertaining to the collection of checks state: "A paying bank that receives a cash item directly or indirectly from a Reserve Bank, other than for immediate payment over the counter, and that pays for the item as provided in § 210.9(a) of this subpart, may recover the payment if, before it has finally paid the item, it: (1) Returns the item before midnight of its next banking day following the banking day of receipt; or (2) Takes any other action to recover the payment within the times and by the means provided by State law."

of the importance of securing uniformity in the interpretation of the provisions of the Uniform Commercial Code among the various jurisdictions (Com. Code, § 1102, subd. (2)(c))." (*Bank of America v. Security Pacific Nat. Bank, supra,* 23 Cal.App.3d at p. 643, italics added; 3 Witkin, Summary of Cal. Law (9th ed. 1987) Negotiable Instruments, § 154, pp. 389-390.)

Although no other California decision bears on the subject, numerous decisions from other jurisdictions have held that a payor bank is strictly liable for its failure to return an item before expiration of the applicable midnight deadline. The Supreme Court of New Mexico stated in *Engine Parts* v. *Citizens Bank of Clovis* (1978) 92 N.M. 37 [582 P.2d 809] that the liability created by that state's version of section 4302 (§ 50A-4-302) is "independent of negligence and is an absolute or strict liability for the full amount of the items which it fails to return." (582 P.2d at p. 815; see, also, *Morgan Guar. Trust Co.* v. *American Sav. and Loan* (9th Cir. 1986) 804 F.2d 1487, 1499; *State and Sav. Bank of Monticello* v. *Meeker* (Ind.App. 1984) 469 N.E.2d 55, 57-58.) In *Reynolds-Wilson Lumber* v. *Peoples Nat. Bank* (Okla. 1985) 699 P.2d 146, the Supreme Court of Oklahoma held pursuant to its version of section 4302 that the word " '[a]ccountable' has been uniformly construed to mean strict liability for the full amount of the draft, *with no requirement that there be proof of actual damage.* [Citations.]" (*Id.,* at p. 152, italics added.)

In *First State Bank* v. *Twin City Bank* (1986) 290 Ark. 399 [720 S.W.2d 295], the defendant urged that because the plaintiff depositary/collecting bank had failed to use ordinary care in granting immediate credit to a customer who later was discovered to be operating a check-kiting scheme, the defendant should not be liable for its omission to return the depositary drafts before the midnight deadline imposed by section 85-4-302 (that state's version of § 4302). The court, rejecting this argument, stated: "Even if the evidence reflects that [the plaintiff] was negligent, this argument would fail because the liability created by § 85-4-302(b) is a statutory liability and is independent of liability based upon negligence. [Citations.]" (720 S.W.2d at p. 296.)

In *Toronto-Dominion Bank* v. *Cent. Nat. Bank & Trust* (8th Cir. 1985) 753 F.2d 66, the plaintiff depositary bank brought an action to recover the face amount of checks which the defendant payor bank had dishonored and failed to return by the midnight deadline. The defendant asserted in defense that one of the plaintiff's employees had participated in a check-kiting scheme with the perpetrator of the fraud and therefore the plaintiff had acted in bad faith. The court ruled that unless the activities of the plaintiff's employee induced the defendant to return the checks after expiration of its deadline and thereby breach its obligation pursuant to section 554.4302 (the

State of Iowa's version of § 4302), the defendant could not assert this as an affirmative defense. (753 F.2d at p. 70.)

These cases support our conclusion that respondent may be held strictly liable for its failure to return the checks by the applicable deadlines, regardless whether appellant demonstrated it suffered actual damage solely as a result of respondent's omission. As respondent suggests, section 1103 provides that general principles of law, which would include the defense that a party's own negligence caused its loss, may apply where not displaced by specific provisions of the Commercial Code. As the above cases indicate, however, the rule of strict liability afforded by section 4302 does displace the defense that appellant's own negligence caused its loss. In order to further the statutory objectives of certainty and finality, a bank that fails to return a check by the midnight deadline is deemed to have paid it and thus is held accountable.

In connection with a discussion of the duty of a collecting bank pursuant to New York Uniform Commercial Code section 4-202 to use ordinary care in forwarding checks for collection and in returning checks deemed uncollectible, where the plaintiff also is shown to be negligent, the court in *United States Fid. & Guar.* v. *Federal Reserve Bank* (S.D.N.Y. 1985) 620 F.Supp. 361 discussed certain differences in the respective goals of tort law and of the Uniform Commercial Code. It noted that tort law "is designed primarily to apportion loss" and that the guiding principle in such an apportionment is fairness. "In tort law courts have equated fairness with fault. The rule of comparative negligence is a perfect expression of this principle. [¶]The UCC, however, was designed to facilitate commerce primarily by guiding and making predictable the consequences of behavior," and its loss apportionment function is secondary to this primary function. (*Id.*, at p. 370; *Town & Country State Bank* v. *First State Bank* (Minn. 1984) 358 N.W.2d 387, 395.)

Although, for example, tort law ordinarily would distribute loss caused by a forged signature or endorsement on a negotiable instrument on the basis of fault, "[t]he UCC, however, for the most part does not look at actual fault. [Fn. omitted.] Instead, it places responsibility on the party which ordinarily would be in the best position to prevent the loss. [Fn. omitted; citations.] Such a result accomplishes two purposes: first, it increases the efficiency and fraud-resistance of the banking system by placing upon those best able to guard against it the responsibility for preventing fraud [fn. omitted], and, second, it speeds the resolution of disputes by establishing clear rules of liability which do not depend heavily upon the specific facts of individual instances of fraud. [Citation.]" (*United States Fid. & Guar.* v. *Federal Reserve Bank, supra,* 620 F.Supp. at p. 370.) The

check clearance chain among banks appropriately has been described as "a high stakes game of hot potato." (*United States Fid.* v. *Fed. Reserve Bank* (S.D.N.Y. 1984) 590 F.Supp. 486, 499.)

Respondent cites *United States Fid. & Guar.* v. *Federal Reserve Bank, supra,* 620 F.Supp. 361, and *United States Fid.* v. *Fed. Reserve Bank, supra,* 590 F.Supp. 486, authored by the same judge, for the proposition that a payor bank's liability pursuant to section 4302 may arise only where a depositary bank *relies* upon the payor bank's failure to transmit "notice of dishonor" by its midnight deadline.

The earlier of these cases, *United States Fid.* v. *Fed. Reserve Bank, supra,* 590 F.Supp. 486, discusses the liability of an intermediary federal reserve bank to the plaintiff depositary bank, which had been victimized by a check-fraud scheme involving alteration of the magnetic ink character recognition number, for the failure to use ordinary care required by New York Uniform Commercial Code section 4-202 in notifying the "downstream" bank of the payor bank's "dishonor." In that case, all five banks which processed the check did so within a day of their respective receipt of the check, in each case meeting their respective midnight deadline (*id.,* at p. 490), and thus the issue of a bank's liability for failing to meet the midnight deadline did not arise. The case does not hold that a depositary bank must prove that in paying the check, it relied upon the circumstance that the payor bank did not furnish it with "notice of dishonor" by its midnight deadline.

The later decision, *United States Fid. & Guar.* v. *Federal Reserve Bank, supra,* 620 F.Supp. 361, 373, is a continuation of the same case after the plaintiff amended the complaint to assert claims against a payor bank. In that case, the court concluded that the payor bank was not liable to the depositary bank for the payor bank's failure to return a dishonored check by its midnight deadline, where the depositary bank recklessly released funds against an $880,000 check drawn on an account which the depositary bank had been informed (at least six days prior to its release of the funds) was nonexistent. (*Ibid.*) After citing numerous cases holding that Uniform Commercial Code section 4-302 "does not shift the burden of loss to a payor bank which misses its deadline if the payee was already aware when presenting the check that it would not be accepted or paid except by mistake," the court observed: "The same policy reasons which preclude recovery under § 4-302 by those who forward checks which they have reason to know are uncollectible also argue in favor of precluding [the plaintiff depositary bank] from recovering. It had reason to know of the uncollectability of Goldstein's check. Therefore, it can and should be estopped from claiming that at the time it suffered the loss it was not aware that [the payor bank] would refuse the check." (*United States Fid. & Guar.* v. *Federal Reserve*

*Bank, supra*, 620 F.Supp. 361, 373.) The court observed that the payor bank should not be held liable where it provided information the account did not exist and the depositary bank chose to ignore the information and release funds against the check. (*Ibid.*)

In the present case, by contrast, there is *no* evidence appellant had learned before releasing the funds that there was no money in the account of Golden Fields Leasing Company, Inc., and the evidence is disputed as to exactly when appellant learned there were insufficient funds to cover the amounts of the various checks. Although respondent asserts appellant learned on January 27, 1986, through oral communication from respondent's employees that there were insufficient funds in the account and that respondent would not honor any other checks drawn on that account, appellant provided evidence respondent did not inform appellant that any further checks submitted would be dishonored.

In addition, despite whatever respondent communicated to Ms. Pou San Au, it has not been clearly established that respondent's oral notification satisfied the statutory definition of "notice of dishonor." Section 4302 provides that a payor bank either must return the item or "*send notice* of dishonor" prior to expiration of its midnight deadline. It is obvious from the wording of the statute that written notice is contemplated. We reject the conclusion urged by respondent that appellant must establish that it relied upon respondent's failure to transmit "notice of dishonor" before the midnight deadline in order to recover for breach of the liability created by section 4302 where, as here, appellant had no knowledge, at the time the checks were deposited or funds were released, that the checks were uncollectible.

Respondent also asserts that it returned the items prior to expiration of the applicable midnight deadlines if the time is calculated from when it received the items from Decimus Corporation until when it sent "notice of dishonor." The evidence establishes, however, that Decimus Corporation was respondent's agent for receipt of the items, and was not, as respondent suggests, another collecting bank. Were we to conclude otherwise, a payor bank always could avoid the operation of section 4302 by interposing such an entity for receipt of items from the presenting bank, and that entity indefinitely could delay the final disposition of an item, thus defeating the protection sought to be afforded by imposing strict deadlines for final payment or "dishonor."

In light of the concerns expressed by respondent in its petition for rehearing, we emphasize that the preceding discussion relies upon the facts as they have been presented thus far, in accordance with the rules regarding the respective burdens of the moving and opposing parties in a motion for summary judgment. The parties remain free to develop additional evidence

at trial which might enable them to renew the arguments raised before this court.

We therefore conclude that the superior court erred in granting summary judgment in favor of respondent. Because we reverse the summary judgment, we do not reach the issue whether the superior court erred in not awarding respondent attorney's fees as the prevailing party.

### Disposition

The judgment is reversed. Appellant shall recover its costs on appeal.

Goertzen, J., and Epstein, J., concurred.

A petition for a rehearing was denied May 30, 1991, and respondent's petition for review by the Supreme court was denied August 1, 1991.