401 So.2d 14 (1981)
CENTRAL BANK OF ALABAMA, N. A.
v.
PEOPLES NATIONAL BANK OF HUNTSVILLE.
79-432.
Supreme Court of Alabama.
May 28, 1981.
Rehearing Denied July 2, 1981.
John M. Heacock, Jr. of Lanier, Shaver & Herring, Huntsville, for appellant.
Paul L. Millirons of Stephens, Millirons, Harrison & Walker, Huntsville, for appellee.
*15 EMBRY, Justice.
This appeal is from a judgment in favor of plaintiff Peoples National Bank of Huntsville and against defendant Central Bank of Alabama, N. A. in an action asserting that Central was liable to Peoples in the amount of $82,000 on account of the payment to Beth B. White of that amount when a worthless check drawn upon her account at Central was accepted by Peoples.
Peoples originally asserted two theories of recovery. By stipulation the parties agreed that the sole issue for determination by the trial court was the "midnight deadline" theory. Simply stated, that theory makes the depository or payor bank liable to pay the forwarding bank the amount of a check if, after presentment and receipt, the check is not returned by the midnight deadline. Midnight deadline is defined in Code 1975, § 7-4-104:
(h) `midnight deadline' with respect to a bank is midnight on its next banking day following the banking day on which it receives the relevant item or notice or from which the time for taking action commences to run, whichever is later;
No contention is made by either of the parties that any of the transactions pertinent to this case took place on any day other than a "banking day."
The parties in brief and in oral argument treat what they regard to be three issues. In fact, resolution of this case under the midnight deadline theory is determinative of this appeal and no other issue need be discussed or resolved.
Peoples contends that under the midnight deadline theory Central was correctly found liable because Central failed to comply with Code 1975, § 7-4-302:
... [I]f an item is presented on and received by a payor bank the bank is accountable for the amount of:
(a) A demand item other than a documentary draft whether properly payable or not if the bank, is any case where it is not also the depositary bank, retains the item beyond midnight of the banking day of receipt without settling for it or, regardless of whether it is also the depositary, does not pay or return the item or send notice of dishonor until after its midnight deadline ...."
On the other hand, Central says the trial court's judgment is erroneous because, under the facts of this case, Central complied with the provisions of Code 1975, § 7-4-301:
(1) Where an authorized settlement for a demand item (other than a documentary draft) received by a payor bank otherwise than for immediate payment over the counter has been made before midnight of the banking day or receipt the payor bank may revoke the settlement and recover any payment if before it has made final payment (subsection (1) of § 7-4-213) and before its midnight deadline it:
(a) Returns the item; or
(b) Sends written notice of dishonor or nonpayment if the item is held for protest or is otherwise unavailable for return.

* * * * * *
(4) An item is returned:
(a) As to an item received through a clearing house, when it is delivered to the presenting or last collecting bank or the clearing house or is sent or delivered in accordance with its rules; or
(b) In all other cases, when it is sent or delivered to the bank's customer or transferor or pursuant to his instructions.
The following is a summary of the pertinent facts included in the trial court's findings of fact made after a nonjury trial. They are amply supported by the evidence. On 18 September 1978, Mrs. Beth B. White presented the check, the subject of this litigation, to the Dunnavant's Mall Branch of Peoples National Bank of Huntsville. She was the maker of the check which was drawn on her account at the Florence branch of Central Bank. Peoples paid her the proceeds of the check and then forwarded it with a cash letter to the Federal Reserve Bank in Birmingham, which is a clearing house for the litigant banks. According *16 to standard procedure, the Federal Reserve Bank made a provisional credit to Peoples' account and simultaneously debited the account of Central at Florence. Both actions occurred on 20 September 1978. The check arrived at Central Bank's designated place of presentment at the Decatur Data Processing Center on 20 September 1978. This is also known as Central Computer Center, Inc. On that same date, when the check was received by that center it was stamped "processed" and debited against Mrs. White's account. That center performed the basic bookkeeping and data processing functions for the various branches of Central, including that at Florence, as well as substantially all the accounting functions of the Florence branch. However, the Florence branch did check for forgeries and make the final decision whether an item should be returned or not. On 21 September 1978, the check was delivered to the Florence branch of Central where it was determined that the endorsement of the payee, her son, was a forgery and the credit balance in Mrs. White's account was conditional and based upon "uncollected funds."
Uncollected funds are funds posted in an account based upon checks payable by, but not collected from, various other banks upon which the deposited checks were drawn. On 22 September 1978, a courier of Central took the check in question to Peoples in Huntsville. The check was returned to Central at Florence by the same courier on that same day. On 23 September 1978, Central at Florence deposited the check with the courier service for the Birmingham Federal Reserve. It was received by the latter on 25 September 1978. To return the subject check through the Birmingham Federal Reserve, acting as a clearing house, all required is that the check with a cash letter be deposited in the Federal Reserve courier service depository. Such could have been accomplished on the 22nd of September after the return of the courier from Huntsville. The check was returned by the Federal Reserve directly to Peoples after debiting Peoples reserve account in the amount of $82,000. Regulation "J," CFR 210.12, is controlling in cases where items are forwarded through the Federal Reserve System. Among other things, it provides that a paying bank shall have the right to recover payment or remittance if it "... takes such other action to recover such payment or remittance within such time and by such means as provided by applicable state law ...." The applicable state law is Code 1975, § 7-4-301.
As we can see from these facts, there was an attempt to make a direct return of the check and also an attempt to return it through a clearing house;[1] each after midnight of 21 September 1978.
The pivotal determination to be made in this case is the time when the midnight deadline began to run on Central. The trial court did not reach the issue of when Central's midnight deadline began to run. Central contends the deadline did not begin to run until the check arrived at its Florence branch on 21 September 1978. Central says that because the trial court failed to decide the issue of when Central's midnight deadline began to run, whether upon arrival of the check at the computer center or at the Florence branch, that in the event of a reversal of the trial court upon the first two issues, as stated by it, this case should be remanded for an initial determination of the third issue by the trial court. The trial court stated those issues as follows:
1. Did the defendant abort its return of the subject item prior to effective delivery of the same on September 22, 1978?
2. Is Code of Alabama 1975 § 7-4-106 applicable to presenting banks as well as to payor bank? An answer to this question is determinative as to whether or not a delivery to The Madison Street Branch of the plaintiff was an effective return to the presenting bank.
3. Is a computer center, which is the designated place of presentment, and which performs all the basic bookkeeping functions for a bank or a branch thereof, *17 a `separate bank' under § 7-4-106, supra. An answer to this question is determinative as to whether the time for the midnight deadline began to run on September 20, 1978 or September 21, 1978.
It appears that a determination of any one of the stated issues favorable to the plaintiff would be determinative of this cause.
We cannot agree, because the trial court, though assigning erroneous reasons, arrived at the correct result in this case; therefore, its judgment is due to be affirmed. City of Montgomery v. Couturier, 373 So.2d 625 (Ala.1979); International Resorts, Inc. v. Lambert, 350 So.2d 391 (Ala. 1977); City of Birmingham, a Municipal Corp. v. Community Fire District, a Public Corp., 336 So.2d 502 (Ala.1976). We have no difficulty in making the determination about the beginning of the running of the midnight deadline. Peoples relies heavily, and rightfully so, on the case of Farmers and Merchants Bank of Long Beach v. Bank of America National Trust and Savings Association, 98 Cal.Rptr. 381, 20 Cal.App.3d 939 (1971). Appellant contends that its Florence branch was a separate bank as defined by Code 1975, § 7-4-106:
§ 7-4-106. Separate office of a bank.
A branch or separate office of a bank is a separate bank for the purpose of computing the time within which and determining the place at or to which action may be taken or notices or orders shall be given under this article and under article 3.
That being true, Central says, then of necessity, its midnight deadline did not begin to run until the check arrived at its Florence branch. We agree that the Florence branch is a separate bank for purposes of § 7-4-106. However, we cannot agree that the midnight deadline did not begin to run until the check arrived at the Florence branch. Farmers and Merchants Bank of Long Beach, supra, is strikingly similar to this case. Because we deem it controlling as precedent, we burden this opinion with an extensive quote from that case:
"The Central issue before the court below was whether both the Bank of America and Farmers and Merchants were barred from returning their respective sets of checks to each other because each of them held the checks beyond the time limits prescribed by section 1013 of the Financial Code.1 In order to decide the correctness of the court's holding it becomes necessary to determine whether the time set forth under section 1013 begins to run when the checks were delivered to Bank of America's Montebello computer center (as held by the court below), or whether the statutory time begins to run after their arrival at the Harbor-Orangewood branch, as appellant, Bank of America, urges upon us. Assuming that receipt of the checks by the Montebello computer center was receipt by the drawee branch within the meaning of section 1013, then the trial court correctly found that Exhibits 1-4 and 8 and 9 were not dishonored in time, since these checks were returned after midnight of the next business day after receipt.2
"1 Section 1013 of the Financial Code read[s] in part:
"`In any case in which a bank receives, other than for immediate payment over the counter, a demand item payable by, at or through such bank and gives credit therefor before midnight of the day of receipt, the bank may have until midnight of its next business day after receipt within which to dishonor or refuse payment of such item. Any credit so given together with all related entries on the receiving bank's books, may be revoked by returning the item, or if the item is held for protest or at the time is lost or is not in the possession of the bank, by giving written notice of dishonor, non payment, or revocation; provided, that such item or notice is dispatched in the mails or by other expeditious means not later than midnight of the bank's next business day after the item was received. For the purpose of determining when notice of dishonor must be given or protest made under the law relative to negotiable instruments, an item duly presented, credit for which is revoked as authorized by this article, shall be deemed dishonored on the day the item or notice is dispatched. A bank, revoking credit pursuant to the authority of this article, is entitled to refund of, or credit for, the amount of the item.'"
"2 [Footnote two has been omitted.]"
*18 "Bank of America argues that the Harbor-Orangewood branch is a separate bank under section 1012 and section 1018 of the Financial Code, and that time should run from receipt at that office and not from receipt at the Montebello computer. Section 1012 of the Financial Code provides in part: ` * * * (c) each branch or office of a bank shall be deemed a separate bank.'
"Section 1018 of the Financial Code, as in effect at the time of the transaction involved, provides in part: `An item * * received for * * * collection * * * at any other office of the same bank, shall be deemed for all the purposes of this article as * * * payable at another bank.'
"The fact that the Harbor-Orangewood branch is a `branch or office' and therefore a `separate bank' within the meaning of the above code section, in no way negates the fact that the Montebello computer center is part of that branch for purposes of section 1013. The testimony set forth in the facts clearly shows that the Montebello computer center mainly performed the Harbor-Orangewood branch's bookkeeping functions and those acts that were performed by the computer were not performed in the Harbor-Orangewood office. Prior to the formation of the Montebello computer center, the acts being performed by the Montebello computer were performed manually by employees at the Harbor-Orangewood branch. All these facts tend to support the trial court's finding that the Montebello computer was part of the Harbor-Orangewood branch within that meaning of former section 1013 of the Financial Code.3
"3 For the purposes of this appeal, we accept the trial court's theory that receipt by the `Erma' computer, which merely sorted out checks, was not a receipt of checks by the Harbor-Orangewood branch."
"Statutes in other cases similar to Financial Code, section 1013 have been strictly construed4 as to the time limit.
"4 See General Finance Corp. of Florida v. Central and Trust Company (C.A. 5th 1959) 264 F.2d 869; Wisner v. First National Bank of Gallitzin (1908) 220 Pa. 21, 68 A. 955, 17 L.R. A.,N.S. 1266."
"Since the Bank of America failed to return checks 1-4, 8 and 9, and A through F before midnight of the next business day after receipt by the Montebello computer center, those checks were returned beyond the time limit of section 1013."
We think this case clearly falls within the rationale of and is factually similar to Farmers and Merchants Bank exemplified by the quoted paragraph beginning with the words "[T]he fact that the Harbor-Orangewood...."
Under the facts of this case, we think Central Computer Center, the designated place for presentment of items for payment by Central's Florence branch, is part of that branch for purposes of Code 1975, §§ 7-4-104, 7-4-301 and 7-4-302, supra. It follows that the midnight deadline began running when the check arrived at Central Computer Center on 20 September 1978 and expired at midnight 21 September 1978. Central would argue that the conclusion we have reached and our reliance on Farmers and Merchants Bank are unsound and unworkable. Central cites the "Alabama Comment" to § 7-4-106 which notes that in adopting this section defining a branch or separate office as a separate bank for the purposes stated in the section the optional language "maintaining its own deposit ledgers" following the words "separate office of a bank" near the beginning of the section was omitted and therefore the Florence branch is a separate bank even though it does not maintain its own deposit ledgers and the midnight deadline does not begin running until the check arrives at that branch. It makes no difference that it is a separate bank; the computer is still an integral part of it. Central contends that Idah-Best, Inc. v. First Security Bank of Idaho, N. A. Hailey Branch, 99 Idaho 517, 584 P.2d 1242 (1978), is controlling in this case and compels reversal. We do not agree that comparison of the facts in this case with the Supreme Court of Idaho's analysis of the facts in that case would lead us to a different *19 conclusion than that reached by the Idaho Court. A reading of Idah-Best fails to show that the data processing center in that case was the designated place of presentment of a collection item as was here the case. Further, it is important to note that Idaho, unlike Alabama and California, by statute, requires that on the face of the bank checks the designated place of presentment or acceptance must be identified.
Different factual conclusions were reached by the Idaho court than those reached by the trial court and by us in this case. The following quote from Idah-Best will illustrate this:
... An analysis of the operations of the Boise data processing center shows that its functions are limited to the sorting and indorsing process typical of a collecting bank and to the transmitting of information that allows the Salt Lake City computer to keep tentative customer accounts. It is the conclusion of this court that when considered in light of the entire collection and payments process, a check's arrival at the data processing center cannot be characterized as `presentment upon' and `receipt by' the Hailey Branch.
Central expresses grave concern that a substantial and burdensome logistical problem will be created if local branches of Central are required to return the check on the day after its receipt at the computer center where Central has forty branches served by the computer center, some of which are located as much as 100 miles from that center. To allow this reasoning to permit the midnight deadline to begin running from time of receipt at the local branch would be to thwart the very purpose of the midnight deadline: to encourage prompt return of dishonored checks. Moreover, to permit delay of the beginning of the running of the midnight deadline would have the effect of allowing the payor bank to unilaterally decide when the deadline would begin to run by the simple device of choosing the time to forward the check to the branch. Taken to the extreme, the failure of the computer center to forward the check to the branch would never trigger the beginning of the running of the midnight deadline. This argument also ignores the fact of the present state of the art of computer capability, particularly with regard to visual communication between computer and terminals.
For the reasons assigned, the judgment entered below, following an ore tenus trial, is due to be and is hereby affirmed.
AFFIRMED.
FAULKNER, ALMON and ADAMS, JJ., concur.
TORBERT, C. J., concurs specially.
TORBERT, Chief Justice (concurring specially):
I concur on the sole basis that the computer center of Central Bank was the designated place for the presentment of the items which otherwise would have required presentment to the Florence branch of Central under Code 1975, § 7-4-106.
NOTES
[1] Code 1975, § 7-4-301.