[No. A046521. First Dist., Div. Two. Dec. 11, 1991.]

CHICAGO TITLE INSURANCE COMPANY, Plaintiff and Respondent, v. CALIFORNIA CANADIAN BANK, Defendant and Appellant.

**COUNSEL**

Thelen, Marrin, Johnson & Bridges, Ted W. Harris, Jon T. Anderson, Thomas W. Lathram, Robert M. Blum and Ronald F. Lopez for Defendant and Appellant.

Pillsbury, Madison & Sutro, Walter R. Allan, Stephen Stublarec, John M. Grenfell, Mark Schallert and Shawn Hanson for Plaintiff and Respondent.

**OPINION**

**PETERSON, J.**—The present appeal is a successor to a previous decision by this court (Div. Two) in *Chicago Title Ins. Co.* v. *Superior Court* (1985) 174 Cal.App.3d 1142 [220 Cal.Rptr. 507]. In this appeal, we will affirm decisions of the trial court which held (1) California Canadian Bank (the Bank) failed to timely return certain dishonored checks before the relevant "midnight deadline" provided by section 4302 of the California Uniform Commercial Code and applicable regulations; and (2) this failure of timely return renders the Bank "accountable" or strictly liable for the amount of the checks.

## I. FACTS AND PROCEDURAL HISTORY

As the facts have previously been set out in a prior opinion of this court and related opinions of the federal courts, we will summarize the relevant facts here very briefly. (See, generally, *Chicago Title Ins. Co.* v. *Superior Court, supra,* 174 Cal.App.3d at pp. 1144-1146; *United States* v. *Benny* (N.D.Cal. 1983) 559 F.Supp. 264, affd. *United States* v. *Benny* (9th Cir. 1986) 786 F.2d 1410.)

Chicago Title Insurance Company (the Company) acted as escrow agent in numerous transactions initiated by a mortgage broker, Robert Dean Financial (RDF), and its principal client, George I. Benny. The Bank handled certain checks connected with these transactions, as a result of accounts RDF and Benny held at the Bank.

Unfortunately, RDF and Benny were engaged in a massive check fraud operation. As a result, both the Company as the escrow agent, and the Bank

as the financial institution most closely involved, have become entangled in litigation between themselves concerning the large losses generated by the Benny-RDF check fraud scheme. During the period in 1981-1982 when the fraud operated, about $300 million in checks passed through the Bank; Benny and the other defrauders managed to divert roughly $17 million to their own use before their fraud was discovered.

The Company brought this lawsuit alleging, inter alia, that the Bank had caused these losses to improperly fall upon the Company. The Company contended the Bank belatedly returned as dishonored 28 bad checks payable to the Company, *after* the "midnight deadline" by which time the Bank must take such action or be held "accountable" under the California Uniform Commercial Code. (Cal. U. Com. Code,[1] § 4302.)

In *Chicago Title Ins. Co.* v. *Superior Court, supra,* 174 Cal.App.3d 1142, a writ proceeding, we resolved certain legal issues which had arisen in the course of pretrial proceedings. Our Supreme Court denied review, and the matter returned to the trial court for further proceedings in light of our rulings.

The trial court, after hearing the relevant evidence at a bench trial, concluded that the Bank had indeed returned the checks late and was, therefore, "accountable" for the loss. The Bank timely appealed from a judgment including interest of approximately $25 million in favor of the Company.

II. DISCUSSION

A. *Late Return*

■ We affirm the trial court's conclusion that the Bank returned the checks in issue late, after the midnight deadline. Despite the Bank's ingenious arguments to the contrary, the trial court properly interpreted the relevant statutes, regulations, and rules and concluded in a well-reasoned and thorough opinion that the Bank was in violation of its duty to make timely return of the checks.

The relevant facts regarding the return of the checks in issue are essentially uncontested. The Bank had its main Northern California office in San Francisco, and had a San Mateo County branch which returned the 28 checks

---

[1]Unless otherwise indicated, all subsequent statutory references are to the California Uniform Commercial Code.

in issue, totalling about $17 million. The checks were first deposited by the Company at the Bank of San Francisco. That bank then forwarded them via Crocker Bank to the San Francisco office of the Bank for presentment. The next day, they were sent by the Bank from its San Francisco office to its San Mateo branch. That branch (in which the makers of the 28 checks maintained the accounts on which they were drawn) decided to return the checks as dishonored. The checks *left* the Bank's San Mateo branch by courier for the Bank's in-house data processing and computer center in San Francisco before the "midnight deadline," but did not *arrive* at their ultimate destination—14 checks going to the San Francisco clearinghouse and another 14 going directly to Crocker Bank in San Francisco—until the next day. The Bank claimed this return of the checks from the San Mateo branch was timely, since the checks left that *branch* for its in-house San Francisco processing and computer center before the midnight deadline; the Company contended, and the trial court ruled, that the checks were returned untimely since they did not actually arrive at the central clearinghouse in San Francisco or at Crocker Bank before the midnight deadline.

▆▆▆▆ The parties agree that the proper resolution of this issue of timeliness turns upon the interpretation of language contained in the formerly applicable version of certain regulations, issued by the California Bankers Clearing House Association (CBCHA) in order to implement section 4302.[2]

The most pertinent language of CBCHA regulation 7.04.b.2.(c) provides that checks, "drawn payable at a member bank office or branch located outside of the City and County of San Francisco [such as the Bank's San Mateo branch], shall be mailed or dispatched for return by the payor office or branch not later than midnight of the next business day . . . ."

The trial court determined this regulation contained a latent ambiguity as to whether checks must be merely sent on their way by the midnight deadline, or must be actually returned by arriving at their destination by that time. The trial court resolved this ambiguity by reference to extrinsic evidence offered at trial, and in light of the business purposes of the regulations as a whole. The trial court's conclusion was: "The Court finds that Section 7.04(b)(2)(c) requires a bank which performs bookkeeping at a computer center to *return* checks to the Clearing House by midnight of the day following receipt . . . ." (Italics added.)

The Bank conjures up a variety of quite inventive arguments in an effort to overturn the trial court, principally relying upon a perceived distinction

---

[2]The CBCHA regulations are determinative here by virtue of section 4103, which give such clearinghouse rules legally binding force.

between in-county and out-of-county branches; and arguing that a "return" from its San Mateo County branch to its *own* data processing and computer center, for subsequent forwarding to the clearinghouse or a bank on which drawn, was timely under the regulations if the checks were merely so sent by the time of the midnight deadline. Perhaps these arguments might have been more persuasive to the trial court and on appeal if they pertained to the actual facts of the Bank's return policy in this case. Unfortunately, the Bank's internal policy on returns was negligently drafted, so that it directed the Bank's officers to follow a return policy which was certainly untimely as to all checks, including in-county returns.

Put another way, the Bank did not miss its deadline in this case because it put any credence in the distinction it now offers between in-county and out-of-county branches. Rather, the Bank must concede it missed the deadline here not because it relied upon the distinction it now offers, but because its internal procedures did not distinguish *at all* between in-county and out-of-county checks, and directed a return policy which was legally faulty even as to in-county returns.[3]

The extrinsic evidence offered at trial certainly did not support the Bank's position regarding a supposed dichotomy between in-county and out-of-county returns. The testimony indicated that the usual practice of all the other banks was to return checks by *delivering* them to *a clearinghouse* or the bank on which drawn prior to the "midnight deadline."

The Bank argues, however, that the plain language of the regulation supports its argument, and that the Bank thus accidentally complied with the regulation as it should properly be interpreted. We think the most which can be said of this argument is that, as the trial court recognized, the Bank had through diligent, after-the-fact research uncovered an arguable latent ambiguity in the regulations—since removed by amendment[4] —of the sort which sometimes crops up in even the most carefully drafted extensive legal document. However, the testimony at trial and the evidence of trade practice (including the Bank's own internal policy) clearly undermine this argument.

---

[3] The Bank admitted at trial that its returns of in-county checks were routinely late, and that its own policy and procedure manual made no distinction between in-county and out-of-county checks: "An office, regardless of its location, . . . *must [return the check] the same day*." (Italics in original.)

[4] Effective October 5, 1987, the CBCHA regulations were redrafted to eliminate the language in question. The present regulations, extensively redrafted and revised in 1987 and 1989, now simply provide in regulation 5.0.9 that "Eligible items shall be returned not later than . . . the next business day following the date on which the item was settled through the Association."

We agree with the trial court's rejection of the Bank's argument since it is in accord with our own interpretation of the regulation, in light of the evidence presented at trial. (See *Pacific Gas & E. Co.* v. *G. W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 39-41 [69 Cal.Rptr. 561, 442 P.2d 641, 40 A.L.R.3d 1373].)

■ Further, we agree with the trial court's criticism of the Bank's argument that it could somehow suspend the running of the midnight deadline by sending the checks to its own computer center, thereby getting them out of the bank branch proper before the deadline expired. This argument, as the trial court aptly observed, "is also inconsistent with the California case law."

For instance, in *Farmers & Merchants Bank* v. *Bank of America* (1971) 20 Cal.App.3d 939, 942-944 [98 Cal.Rptr. 381], which arose under similar language in the California Financial Code, the Second District rejected the argument that a bank's own computer center, if under a separate roof, was not simply another part of the bank for purposes of return. In *Lawrence* v. *Bank of America* (1985) 163 Cal.App.3d 431, 436 [209 Cal.Rptr. 541], Division Three of this district noted that under *Farmers & Merchants* the physical separation of a computer center from its bank has "no legal significance . . . ." In *Lufthansa German Airlines* v. *Bank of America* (9th Cir. 1981) 652 F.2d 835, 836, 837, footnote 1, a diversity case arising under California law, the Ninth Circuit recognized the *Farmers & Merchants* rule; it also affirmed as not "clearly wrong" an ultimate result reached by a district judge, because the prior notice of dishonor in question did not disclose the identity of the customer who had deposited the check or the branch in which it was deposited, and therefore could not be considered sufficient notice to the collecting bank—a consideration clearly not present here, where no questions surrounding the adequacy of a notice of dishonor arise, and it is the checks themselves which were returned untimely. (Cf. also, e.g., *American National Bank of Powell* v. *Foodbasket* (Wyo. 1972) 497 P.2d 546, 548 (*Foodbasket*) and *United States Fid. & Guar.* v. *Federal Reserve Bank* (S.D.N.Y. 1985) 620 F.Supp. 361, 373, affd. per curiam (2d Cir. 1986) 786 F.2d 77 [Both cases excused a late *notice of dishonor* where the factual circumstances provided a convincing rationale for disregarding the lateness.].)

In *Central Bank of Alabama* v. *Peoples Nat. Bank* (Ala. 1981) 401 So.2d 14, 18 [22 A.L.R.4th 1], the Alabama Supreme Court followed *Farmers & Merchants* in holding that a "Central Computer Center" to which checks were sent was simply another part of the bank: "It makes no difference that

it is a separate bank; the computer is still an integral part of it." (Accord, *South Sound Nat'l Bank* v. *First Int. Bank* (1983) 65 Ore.App. 553 [672 P.2d 1194, 1197] ["We agree with the reasoning of the Alabama court and hold that the First Interstate data processing center is an integral part of its Waverly Branch."].) No case cited by the Bank or disclosed by our own research allows a bank to "return" a check by merely delivering the check to itself for further processing by computer before the midnight deadline expires.[5] There are obviously strong considerations of policy militating against the creation of such a loophole in the Uniform Commercial Code rules on timeliness.

In short, the trial court correctly ruled that the Bank missed the applicable midnight deadline.

### B. *The Bank Is Accountable*

■ Since the Bank did not return the checks in question before the applicable midnight deadline, it is "accountable" or strictly liable for the amount of the checks under section 4302. (*Bank of America* v. *Security Pacific Nat. Bank* (1972) 23 Cal.App.3d 638, 642-643 [100 Cal.Rptr. 438].) "Several cases from other jurisdictions have construed identical language contained in the Uniform Commercial Code to provide a basis for a statutory cause of action for the amount of the demand item [i.e., check] involved [citations]. Those courts have construed the word 'accountable' contained in section 4302 to be synonymous with 'liable' and have imposed liability on the payor bank for the amount of the item for a delay in returning the item

---

[5]The Bank's argument is not at all aided by the belated citation of *Fidelity Bank* v. *Deutsch, Kerrigan & Stiles* (La.Ct.App. 1990) 557 So.2d 991. In *Fidelity Bank*, the Fourth Circuit Court of Appeal of Louisiana found that a check was timely returned when it was placed in the delivery box of a law firm, which the law firm had placed on the bank's premises and which was emptied by the law firm on a daily basis; by prior practice of the parties, the delivery box was "a proper place for *delivery* . . . ." (P. 996, italics added.) If anything, the actual facts of that case would seem to support the Company's argument that a check must be *delivered* to a destination which is not just another part of the Bank; it cannot merely be *sent* to the Bank's own computer center by the expiration of the midnight deadline. There is no claim in this case, for instance, that the Bank's computer center contained a similar delivery box established for this type of return use by parties other than the Bank. The Bank suggests its own computer center is an extension and arm of the Bank, for purposes of *commencing* the running of time toward the midnight deadline for returning checks a branch of the Bank dishonors and returns to another branch or clearing house through that computer center. The Bank conversely suggests the computer center somehow becomes a "separate" bank whose receipt from Bank's own branches of checks it has dishonored, for forwarding to a clearing house or other bank, acts to *terminate* the running of the time towards the same midnight deadline as to those checks. This confusing and anomalous suggestion is supported neither by law, this record, nor indeed by logical analysis.

|beyond the bank's midnight deadline. . . . [¶] . . . [¶] We agree with the reasoning of the above authorities and hold that section 4302 creates a liability independent of negligence . . . for the amount of the item involved. In arriving at this conclusion we are mindful of the importance of securing uniformity in the interpretation of the provisions of the Uniform Commercial Code among the various jurisdictions . . . ." (*Ibid.*)

■ In an attempt to avoid this liability for the late return of the checks in issue here, the Bank conjured up a variety of arguments and claims against the Company, asserted by means of purported defenses of "estoppel, waiver, unclean hands, etc." The trial court ruled that in this context—the statutory liability without regard to negligence specified by section 4302—such defenses "are not valid." The Bank sought to overturn this decision by another writ application, but we denied the application, and the Supreme Court denied review.

The Bank next sought leave to amend to assert a claim for restitution, apparently claiming that the trial court's decision in favor of the Company had caused the Bank harm, and that the Bank was entitled to restitution from the Company for having caused that harm by winning the lawsuit. The trial court rejected this highly inventive argument as well.

The trial court's rulings were correct. (See *Los Angeles Nat. Bank* v. *Bank of Canton* (1991) 229 Cal.App.3d 1267, 1278 [280 Cal.Rptr. 831].) "[N]umerous decisions from other jurisdictions have held that a payor bank is *strictly liable* for its failure to return an item before expiration of the applicable midnight deadline." (*Id.* at p. 1277, italics added.)

■ "These cases support our conclusion that [the Bank] may be held strictly liable for its failure to return the checks by the applicable deadlines, regardless whether [the Company] demonstrated it suffered actual damage solely as a result of [the Bank's] omission. ■ As [the Bank] suggests, section 1103 provides that general principles of law, which would include the defense that a party's own negligence caused its loss, may apply where not displaced by specific provisions of the Commercial Code. As the above cases indicate, however, the rule of strict liability afforded by section 4302 does displace the defense that [the Company's] own negligence caused its loss. *In order to further the statutory objectives of certainty and finality, a bank that fails to return a check by the midnight deadline is deemed to have paid it and thus is held accountable.*" (229 Cal.App.3d at p. 1278, italics added; accord, *Huntmix, Inc.* v. *Bank of America* (1982) 134 Cal.App.3d 347, 358-359 [184 Cal.Rptr. 551].)

■ We agree with Justice George's discussion in *Los Angeles Nat. Bank,* *supra,* and with the similar observations of the New York Court of Appeals in *SOS Oil* v. *Norstar Bank of Long Island* (1990) 76 N.Y.2d 561 [561 N.Y.S.2d 887, 890, 563 N.E.2d 258]: "The midnight deadline rule of UCC 4-302 places a heavy burden on payor banks . . . . The heavy burden imposed by UCC 4-302 serves important commercial purposes: it expedites the collection process by motivating banks to process instruments quickly, and it firms up the provisional credits received by each bank in the collection chain, thereby supplying a key element of certainty in commercial paper transactions [citation]. By requiring that deficiencies in a drawer's account be determined swiftly, the midnight deadline rule is a vital part of the payor bank's role in assuring the integrity of commercial paper [citation]."

■ "Nor can [the Bank] avoid liability here by resort to the defenses of estoppel, account stated, contributory negligence or *illegality of the underlying transaction.*" (561 N.Y.S.2d at p. 891, italics added.) "[S]uch a defense [of estoppel], if allowable at all under UCC 4-302, would require some factual showing that the bank's failure to meet its midnight deadline was a consequence of justifiable reliance on a representation, action or failure to act on the part of [the Company] [citation]. There is no such showing here." (*Id.* at p. 892; cf. also *Bank Leumi Trust Co.* v. *Bally's Park Place, Inc.* (S.D.N.Y. 1981) 528 F.Supp. 349, 351, fn. 4, 352-354 (*Bally's*) [In a diversity action governed by New York law, the court excused the late return of a "blank check" which consisted of a non-computer-readable form, partially filled out and presented for payment after the death of the alleged maker, and which the presenting casino knew to be invalid.].)[6]

In this case, however, the Bank failed to make the midnight deadline because its own operating manual was erroneous, incorrectly stating the applicable deadline. The Company can hardly be accused of misdrafting the Bank's internal policy for the return of checks.

---

[6]While the Bank cites numerous cases from other jurisdictions decided under other sections of the Uniform Commercial Code, and in different factual situations, none of them abrogated the rule of section 4302 in these circumstances. Indeed, one of the Bank's cited cases indicates precisely the opposite: "Courts have universally held that payor banks are strictly liable for violation of 4-302 deadlines." (*Morgan Guar. Trust Co.* v. *American Sav. and Loan* (9th Cir. 1986) 804 F.2d 1487, 1499.) The Bank has not cited nor have we found a case which held the strict liability of section 4302 was subject to the defenses the Bank sought to assert. Both *Los Angeles Nat. Bank, supra* 229 Cal.App.3d 1267, and *SOS Oil, supra,* 561 N.Y.S.2d 887, indicated such defenses are not viable here. In our prior published opinion in this case, we also indicated that " 'Beyond the duty relating to return of the [negotiable] instruments, the . . . bank [herein] had no duty arising out of a relationship to the holder of the checks which could [ripen] into tort liability.' " (*Chicago Title Ins. Co.* v. *Superior Court, supra,* 174 Cal.App.3d at p. 1159, quoting *Pa. Nat. Turf Club* v. *Bank of West Jersey* (1978) 158 N.J.Super. 196 [385 A.2d 932, 936].) We decline to create such a relationship or such tort liability here as well.

■ Moreover, the Bank is not aided by its reference to a 1990 proposed amendment to the Uniform Laws Commissioners' version of Uniform Commercial Code section 4-302, and the official comment thereto—which amendment, as of this writing, has apparently been adopted in certain other states but not in California. (See 2B West's U. Laws Ann. (1991) U. Com. Code, § 4-302 and off. com., pp. 54-55.) The proposed amended version would attempt to codify the results reached in *Foodbasket* and *Bally's*. Those cases held a perpetrator of a check kite could not escape the consequences of his fraud by relying upon a bank's technical failure to meet a midnight deadline, where (1) the perpetrator *knew* the bank would have to reject the invalid check in question—since the maker told the bank it was drawn on insufficient funds (as in *Foodbasket*), or the check was knowingly drawn on the no longer accessible account of a deceased person (as in *Bally's*); and (2) the perpetrator took additional action which would have retarded or defeated a bank's normal check processing procedures—such as requesting a loan to cover the deficiency in *Foodbasket*, or submitting a non-computer-readable check in *Bally's*.

The Bank's reliance on such exceptional cases fails here for a number of reasons. First, California has not adopted the proposed uniform amendment which endorses these results; plainly the amendment was not in force in the relevant period. Further, it is not clear how the amended language, or application of the holdings of the cited cases, could have aided the Bank; the Bank is not suing the actual perpetrators of the check kite, Benny and RDF; and in this instance, the Bank's prior practice had been to honor RDF checks which it knew to be drawn on insufficient funds. Finally, the Bank conceded at argument that nothing the Company did caused the Bank to miss its midnight deadline, by retarding or sabotaging the Bank's internal check-return procedures or otherwise. Thus, the Bank could not on the record before us squeeze through this narrow loophole, even if it were otherwise available. The case is, therefore, governed by the general rule of accountability provided by section 4302.

■ It is important to bear in mind in this context that the Uniform Commercial Code is designed to banish from the law governing timely return of dishonored checks such fact-based theories of liability and defense as negligence, fault, estoppel, intentional tort, or illegality of the underlying transaction in the overriding public interest of promulgating the integrity, certainty, and finality of commercial transactions. Consequently, the Uniform Commercial Code establishes a more mechanical system, characterized by certainty and finality, and based only upon facts unlikely to be disputed in litigation—such as the date stamped on a check upon its receipt, the date it

was returned as dishonored, or the fact of whether the check was not readable by computer or was presented posthumously for payment. As the Second District observed in similar circumstances almost 10 years ago, " 'The plain fact is that in the modern world of check collection a clear cut, mechanical rule of check acceptance is necessary . . . .' " (*Huntmix, Inc.* v. *Bank of America, supra,* 134 Cal.App.3d at p. 359, quoting *Bank Leumi Trust Co.* v. *Bank of Mid-Jersey* (D.N.J. 1980) 499 F.Supp. 1022, 1026; accord, *Los Angeles Nat. Bank* v. *Bank of Canton, supra,* 229 Cal.App.3d at p. 1278 ["In order to further the statutory objectives of certainty and finality, a bank that fails to return a check by the midnight deadline is deemed to have paid it and thus is held accountable."]; see also *Bank of America* v. *Security Pacific Nat. Bank, supra,* 23 Cal.App.3d at p. 643 ["We agree with the reasoning of the above authorities and hold that section 4302 creates a liability independent of negligence [citation] or conversion [citation] for the amount of the [check] involved. In arriving at this conclusion we are mindful of the importance of securing uniformity in the interpretation of the provisions of the Uniform Commercial Code among the various jurisdictions [citation]."].)

We are loath to disturb such a carefully circumscribed, determinate, and reticulated system by our own amendments in the guise of interpretation— especially where, as here, the present system apparently results from a deliberate choice of the drafters which has previously been uniformly enforced and endorsed by the courts. We are also concerned that allowing the Bank to escape the consequences of its delay by indulging its claim of fault or fraud on the part of the Company, which claim is factually unrelated to the actual mechanics of the check return procedure—i.e., a fraud which did not cause the Bank to miss its deadline, would begin to cause the system of reciprocal obligations underlying commercial transactions to unravel in a mass of time-consuming litigation, such as we have glimpsed in these protracted proceedings.

The Bank and its sister institutions are well placed to effect change to this statutory system by advocating legislation or by private agreement. We may not ourselves lightly tamper here with the existing law, even if the result of the application of section 4302 might seem harsh in some contexts.

Finally, the Bank contends at length that it is unfair to require the Bank to bear the loss here[7] because it is being required to make good a large loss caused in whole or in part by the fraud of others. However, the Bank

[7]The Bank points to the malfeasance of lower level operatives at the Company, who it contends connived at or intentionally ignored the fraudulent scheme. The Company makes similar insinuations regarding the Bank and its toleration of the scheme for months after it

itself was in the best position to determine whether the defrauders' accounts with the Bank contained sufficient funds to cover the checks. The Bank, before seeking to dishonor the 28 checks involved in the case at bench, knew for months that RDF checks were apparently not backed by sufficient funds, yet did nothing at the time to stop the defrauders. Unfortunately, when the Bank did act, it was too late.

The trial court correctly rejected the Bank's defenses and cross-claim, since the Bank was strictly liable under section 4302.

III. Disposition

The judgment is affirmed.

Kline, P. J., and Benson, J., concurred.

A petition for a rehearing was denied January 3, 1992, and appellant's petition for review by the Supreme Court was denied April 2, 1992. Panelli, J., was of the opinion that the petition should be granted.

---

became apparent that something was very much amiss in the RDF financial transactions which employed the Bank's resources. As the legal issue here is the strict liability imposed by section 4302, these attempts to fix blame for the fraud of others are in any event beside the point.