FIRST NATIONAL BANK IN
HARVEY, Plaintiff,

v.

COLONIAL BANK and Federal
Reserve Bank, Defendants.

No. 92 C 1679.

United States District Court,
N.D. Illinois, E.D.

Aug. 30, 1993.

Martin W. Salzman, Freeborn & Peters, Eric S. Rein, Bret Andrew Rappaport, Schwartz, Cooper, Kolb & Gaynor, Chtd., Chicago, IL, for plaintiff.

Mitchell S. Goldgehn, Nathan H. Lichtenstein, Andrew Scott Williams, Aronberg, Goldgehn, Davis & Garmisa, Chicago, IL, for Colonial Bank.

Mitchell S. Goldgehn, Nathan H. Lichtenstein, Andrew Scott Williams, Aronberg, Goldgehn, Davis & Garmisa, Elizabeth Ann Knospe, Anna M. Voytovich, Federal Reserve Bank Of Chicago, Chicago, IL, for Federal Reserve Bank.

## MEMORANDUM OPINION

GRADY, District Judge.

This diversity action is before the court on plaintiff's motion for summary judgment on Count V of the complaint. As explained below, the court denies the motion.

### BACKGROUND

On February 10, 1992, First National Bank in Harvey ("First National") received for deposit to the checking account of Shelly International Marketing, Inc. ("Shelly") thirteen checks drawn on the account of World Commodities, Inc. ("World Commodities") at Colonial Bank ("Colonial"). The next day, Colonial received these checks, totalling $1,523,-892.49 (the "Colonial checks"), for payment.

Under § 4–302 of the Uniform Commercial Code ("UCC"), 810 ILCS 5/4–302 (S.H.A. 1993), if Colonial wanted to deny payment, it had until midnight of February 12 to return the checks. After this "midnight deadline," the bank is deemed to have made payment. On February 13, Colonial decided to dishonor the checks and returned them through the Federal Reserve Bank. Although Colonial does not dispute that it failed to meet the midnight deadline, the Federal Reserve Bank debited First National's account in the amount of $1,523,892.49.

The checks at issue were part of a kiting scheme. A kiter withdraws funds to which he is not entitled by drawing checks against deposits which have not yet cleared through the banks. In other words, a kiter takes advantage of the "float," the time elapsing between the deposit of a check in one bank and its collection at another. According to Colonial, World Commodities and Shelly are related entities which took advantage of the float by shuffling funds back and forth between their accounts at First National and Colonial. Most if not all of the deposits into the World Commodities account were drawn on the Shelly account, and vice versa. *See* Affidavit of Joanne Topham ¶ 3.

In this action against Colonial and the Federal Reserve Bank, First National seeks recovery of the amount debited from its Fed account. The complaint alleges breach of contract and causes of action under Federal Reserve Regulation CC and Article 4 of the Illinois UCC. Before the court is First National's motion for summary judgment against Colonial on Count V of the complaint, which is based on UCC § 4–302. First National asks the court to enter judgment in its favor for the face amounts of the checks.

Colonial urges us to deny summary judgment because First National has presented no evidence of loss. According to Colonial, the Federal Reserve Bank credited First National's account for $1,523,892.49, the amount of the disputed checks, on February 10. In addition, it is unclear whether Shelly withdrew the disputed funds from its account, and if it did, whether it repaid those funds to First National.

Colonial also argues the midnight deadline rule should be relaxed because of confusion created by First National's return of several checks drawn on Shelly's account (the "First National checks") and deposited into World Commodities' account at Colonial. At 9:30 a.m. on February 12, First National notified a Colonial employee that it would be returning certain checks, but it notified the wrong employee and did not specify the number or dollar amounts of those checks. When Colonial attempted to contact First National a few hours later to obtain more information, it was advised by a pre-recorded message that First National's offices were closed. Although First National sent wire notices to Colonial later that day stating seventeen checks totalling $1,518,642.86 were being returned "refer to maker," First National did not explain the basis for rejection.

The same day, Andrew Schiller, a vice president at Colonial, contacted Charles Patterson, World Commodities' comptroller, to ask about the seventeen checks. Patterson told Schiller that First National was returning the checks because it was reneging on an increase in Shelly's line of credit. Patterson assured Schiller that the line of credit would be re-approved and asked him to redeposit the checks. Alan Jay Goldstein, the attorney for Shelly and World Commodities, apparently confirmed this explanation. Only after concluding First National would continue to dishonor the checks and thereby decrease the balance in the World Commodities account did Colonial find it necessary to dishonor the Colonial checks.

### DISCUSSION

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). "A genuine issue of material fact exists only where 'there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" *Dribeck Importers, Inc. v. G. Heileman Brewing Co.*, 883 F.2d 569, 573 (7th

Cir.1989) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)). In considering such a motion, the court must view all inferences in the light most favorable to the non-moving party. *See Regner v. Chicago*, 789 F.2d 534, 536 (7th Cir.1986). Once the moving party has supported its motion for summary judgment, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings;" rather, the adverse party must set forth facts showing that there is a genuine issue for trial. Fed. R.Civ.P. 56(e).

### Excusable Delay Under UCC § 4–109(b)

■ Section 4–109(b) of the UCC excuses certain violations of the midnight deadline:

> Delay by a collecting bank or payor bank beyond time limits prescribed or permitted by this Act or by instructions is excused if (i) the delay is caused by interruption of communication or computer facilities, suspension of payments by another bank, war, emergency conditions, failure of equipment, or other circumstances beyond the control of the bank, and (ii) the bank exercises such diligence as the circumstances require.[1]

810 ILCS 5/4–109(b). This section ordinarily applies to extend the midnight deadline when some condition beyond the control of the payor bank renders it physically impossible for that bank to return the checks. Examples of situations which may excuse delay include: " 'blizzards, floods, hurricanes, and other 'Act of God' events or conditions, and wrecks and disasters, interfering with mails; [and] abnormal operating conditions such as substantial increased volume or substantial

shortage of personnel during war or emergency situations.' " *State and Sav. Bank of Monticello v. Meeker*, 469 N.E.2d 55, 58 (Ind. App.1984).

Colonial contends that the apparent confusion caused by First National's rejection of the checks drawn on the Shelly account and deposited in the World Commodities account caused excusable delay under § 4–109(b). While First National's rejection of the checks would affect the balance in the World Commodities account at Colonial, and thus would influence Colonial's decision whether to dishonor the checks drawn on that account, we do not believe First National's conduct excused Colonial's violation of the midnight deadline. As Colonial admits, it was notified more than twelve hours before the midnight deadline that First National was rejecting the checks drawn on the Shelly account. Even if the reason for the rejection was not clear, Colonial knew, in sufficient time to comply with the midnight deadline, that the balance in the World Commodities account may not have been enough to cover the Colonial checks. These circumstances do not constitute conditions beyond the payor bank's control as contemplated by § 4–109.[2] *See State and Sav. Bank of Monticello*, 469 N.E.2d at 58 (difficulty in ascertaining the balance in a customer's account is not a condition beyond the control of the payor bank); *New Ulm State Bank v. Brown*, 558 S.W.2d 20, 26 (Tex.Civ.App.1977) (same).

### Requirement of Actual Damage Under UCC § 4–302

■ UCC § 4–302 describes the midnight deadline rule and establishes liability for its violation:

---

1. Section 4–105 defines the relevant banking terms:

   \* \* \* \* \* \*

   (2) "Depositary bank" means the first bank to take an item even though it is also the payor bank, unless the item is presented for immediate payment over the counter:
   (3) "Payor bank" means a bank that is the drawee of a draft; ....
   (5) "Collecting bank" means a bank handling an item for collection except the payor bank....

   810 ILCS 5/4–105.

2. Colonial also argues that First National made the decision to return the First National checks on February 11, the day before it attempted to give notice. According to Colonial, this "strong-

ly suggests that [First National] intentionally delayed and manipulated the notice of return of the [First National] Checks in a deliberate effort to cause Colonial Bank to miss its midnight deadline with respect to the Colonial Checks." Supplemental Memorandum at 9. Colonial states this evidence creates an issue of bad faith excusing noncompliance with the midnight deadline. We disagree that the evidence of delay, standing alone, tends to prove that First National sought to cause Colonial to miss the midnight deadline. Likewise, there is no evidence that First National knew the Colonial checks were based on insufficient funds and "presented or transferred [those items] for the purpose of defrauding the payor bank." 810 ILCS 5/4–302(b).

(a) If an item is presented to and received by a payor bank, the bank *is accountable for the amount of:* (1) *a demand item,* other than a documentary draft, whether properly payable or not, *if the bank,* in any case in which it is not also the depository bank, *retains the item beyond midnight of the banking day of receipt* without settling for it or, whether or not it is also the depository bank, does not pay or return the item or send notice of dishonor until after its midnight deadline

. . . .

(b) The liability of the payor bank to pay an item pursuant to subsection (a) is subject to defenses based on breach of presentment warranty (Section 4–208) or proof that the person seeking enforcement of the liability presented or transferred the item for the purpose of defrauding the bank.

810 ILCS 5/4–302 (emphasis added). This bright-line rule speeds up the collection of checks through the banking system and provides certainty in the check collection process. *See Starcraft Co. v. C.J. Heck Co.,* 748 F.2d 982, 986 (5th Cir.1984) (citations omitted).

Attempting to avoid dispute over the meaning of the terms "accountable for the amount of" the check, First National claims to have shown loss in the amount of the debit to its Fed account. According to Colonial, however, the Fed had earlier credited First National's account for the same amount. Also, it is unclear whether Shelly withdrew the disputed funds, and if it did, whether it repaid those funds. Because First National does not confront these contentions, we find the extent of damages to be disputed and thus inappropriate for determination on summary judgment. The question we can resolve on this motion is whether the payor bank is accountable for the amount of the check under § 4–302 even in the absence of damages.

Several courts have described § 4–302 liability as "strict." *See, e.g., Starcraft Co.,* 748 F.2d at 986. According to First National, strict liability means the payor bank is liable for the face amount of the check if it fails to comply with the midnight deadline, even if the depository bank has suffered no loss.[3] *See Chicago Title Ins. Co. v. California Canadian Bank,* 1 Cal.App.4th 798, 809, 2 Cal. Rptr.2d 422 (1991) (the payor bank "may be held strictly liable for its failure to return the checks by the applicable deadlines, regardless of whether the [depository bank] demonstrated it suffered actual damage solely as a result of the [payor bank's] omission"); *Citizens Fidelity Bank & Trust Co. v. Southwest Bank and Trust Co.,* 238 Neb. 677, 472 N.W.2d 198 (1991) (no requirement of actual damages under § 4–302); JAMES J. WHITE & ROBERT S. SUMMERS, UNIFORM COMMERCIAL CODE § 17–4, at 851 (3d Ed.1988 & Supp.1992) ("one who makes final payment is accountable for the amount of the item irrespective of the loss the others may have suffered"). *But see State and Sav. Bank of Monticello,* 469 N.E.2d at 55 (award of damages under § 4–302 decreased to the extent plaintiff had mitigated its damages); *Union Bank of Benton v. First Nat'l Bank,* 621 F.2d 790 (5th Cir.1980), *appeal after remand,* 677 F.2d 1074, 1076 (5th Cir.1982) (same); *Met Frozen Foods Corp. v. Nat'l Bank of North America,* 89 Misc.2d 1033, 1042, 393 N.Y.S.2d 643 (1977). Otherwise, the argument goes, the certainty and promptness in check collection created by the midnight deadline rule would be undermined. *See Chicago Title Ins. Co.,* 1 Cal.App.4th at 809, 2 Cal.Rptr.2d 422.

Recently, the Illinois legislature has made several amendments to the liability provisions of the relevant sections of the Illinois UCC. After First National moved for summary judgment on Count V, the Illinois legislature amended § 4–302(b) so that the liabili-

---

**3.** Federal Reserve Regulation CC, which also establishes time limits for dishonoring checks, indisputably requires the depository bank to present evidence of actual loss. Under that regulation, the measure of damages is "the amount of the loss incurred, up to the amount of the check, reduced by the amount of the loss that party would have incurred even if the bank had exercised ordinary care." 12 CFR § 229.38(a). In addition, "a bank that fails to act in good faith under this subpart may be liable for other damages, if any, suffered by the party as a proximate consequence." *Id.* The regulation allows the party to choose whether to sue for damages under the UCC or under the regulation. *See* 12 CFR § 229.38(b).

ty of the payor bank "shall not exceed the amount of the damages suffered." Public Act 87–1242 (eff. Dec. 24, 1992). A few months later, the legislature repealed this amendment to § 4–302(b) and added the defense of unjust enrichment to UCC § 1–103, which now provides as follows:

> Unless displaced by the particular provisions of [the Illinois UCC], the principles of law and equity, including the law merchant and the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, *unjust enrichment*, bankruptcy, or other validating or invalidating cause shall supplement its provisions.

810 ILCS 5/1–103 (emphasis indicates the change in the section).

The parties dispute the effect of this change in § 1–103. Colonial asserts the change codifies existing case law and makes explicit the requirement of actual damages under the liability provisions of the Illinois UCC, including § 4–302. Colonial offers portions of the legislative history of the amendment in support of its interpretation:

> The two changes contained in the Amendment will restore the original language of Section 4–302(b) and also provide the same proper clarification of Illinois law in a manner ensuring that an Illinois bank's capital will not be impaired by reason of unjust enrichment to another bank as a result of a recovery not permitted under general equitable principles.

Statement of Representative Lang before the Illinois House of Representatives, April 22, 1993. First National does not dispute that, prior to the amendment, courts read an unjust enrichment defense into § 1–103. *See, e.g., Midwest Indus. Funding v. First Nat'l Bank of Lockport*, 973 F.2d 534, 538 (7th Cir.1992); *Spec–Cast, Inc. v. First Nat'l*

*Bank and Trust Co.*, 128 Ill.2d 167, 131 Ill.Dec. 168, 538 N.E.2d 543, 546 (1989). Instead, it insists § 1–103 does not apply to this case because it is "displaced by the particular provisions" of § 4–302, which, after the repeal of the relevant provisions of Public Act 87–1242, does not limit recovery to actual damages. *See Chicago Title Ins. Co.*, 1 Cal.App.4th at 809, 2 Cal.Rptr.2d 422 (§ 4–302 displaces the defense of contributory negligence available under § 1–103); *Los Angeles Nat'l Bank v. Bank of Canton*, 229 Cal.App.3d 1267, 1276–77, 280 Cal.Rptr. 831 (1991) (same); *Bank Leumi Trust Co. v. Bank of Mid–Jersey*, 499 F.Supp. 1022, 1027 (D.N.J.1980).[4]

Despite the language of § 4–302 making the payor bank "accountable for the amount" of the check, we agree with Colonial that the Illinois courts would not award the face value of the check where the depositary bank did not allow its customer to withdraw some or all of the disputed funds or obtained repayment of those funds. As First National concedes, Illinois cases have already allowed the defense of unjust enrichment[5] under Article III of the UCC. In *Lurz v. Panek*, 172 Ill.App.3d 915, 123 Ill.Dec. 200, 209–10, 527 N.E.2d 663, 672–73 (2d Dist.1988), plaintiff, a co-payee on a check, sued the depositary bank and the drawee of the check for allowing payment on a forged endorsement. Under Illinois UCC § 3–419 (now § 3–420, 810 ILCS 5/3–420[6]), the drawee's liability for paying a check on a forged endorsement "is the face amount of the instrument." Despite this arguably mandatory damages provision, the court limited the plaintiff's recovery to the face value of the check minus repayment received from the co-payee of the check. Similarly, in *Midwest Indus. Funding*, 973 F.2d at 538, the Seventh Circuit, citing the Illinois Supreme Court's decision in *Spec–*

---

**4.** First National also urges us to reject retroactive application of the amendment to § 1–103. Because the amendment merely codifies existing case law, the retroactivity argument is baseless. For the same reason, we reject First National's suggestion that the Illinois legislature is improperly trying to dictate the outcome of this case.

**5.** A party may recover on an unjust enrichment claim if it proves "an unjust retention of a benefit, including money, by one party to the detri-

ment of another party, against fundamental principles of justice, equity, and good conscience." *Douglass v. Wones*, 120 Ill.App.3d 36, 76 Ill.Dec. 114, 121, 458 N.E.2d 514, 521 (2d Dist.1983).

**6.** Section 3–420, effective after *Lurz*, modified § 3–419 so that damages are now "presumed [rather than required] to be the amount payable on the instrument."

*Cast,* 128 Ill.2d 167, 131 Ill.Dec. at 171, 538 N.E.2d at 546, held that a bank could raise unjust enrichment as a defense to a claim that it converted checks by paying them without obtaining the endorsements of both payees. The Seventh Circuit allowed the defense even though § 3–401(a), 810 ILCS 5/3–401(a), provides that a "person is not liable on an instrument unless the person signed the instrument."

We find no meaningful distinctions between the instant case and *Lurz, Midwest Indus. Funding,* and *Spec–Cast* which would prevent Colonial from raising the defense of unjust enrichment and thereby decreasing its liability to the extent First National suffered no loss. The liability provisions of § 4–302 are no less mandatory than the provisions at issue in the Article III cases. In those cases, the courts were faced with similar bright-line liability provisions but did not fear that allowing the defense of unjust enrichment would undermine the policies behind those provisions. Disallowing recovery of the face amount of the check in cases where the depositary bank decreased its loss by preventing withdrawal of some or all of the disputed funds or by obtaining repayment of those funds would not frustrate the purpose of § 4–302: namely, prompt and certain check collection and the " 'need to protect depositary banks who were making funds available for withdrawal to their customers on the basis of a lapse of time without notice of nonpayment.' " *Citizens Fidelity Bank and Trust Co.,* 238 Neb. 677, 472 N.W.2d at 202 (citation omitted). A depositary bank which suffers loss (*e.g.,* by allowing its customer to withdraw the disputed funds) may still recover the loss from the payor bank. *See State and Sav. Bank of Monticello,* 469

N.E.2d at 55 (limiting liability under § 4–302 to the damages suffered by the payee bank); *Union Bank of Benton,* 621 F.2d at 790 (same); *Met Frozen Foods Corp.,* 89 Misc.2d at 1042, 393 N.Y.S.2d 643. However, if the depositary bank sustains no loss, the protection afforded by § 4–302 is simply not needed. The statute should be applied in a manner consistent with its purpose.[7]

### CONCLUSION

Because under § 4–302 First National is not entitled to recover more than the loss it suffered, and because the amount of the loss is disputed, First National's motion for summary judgment on Count V of the complaint is denied. This case is set for a status conference on September 28, 1993, at 9:45 a.m.

---

7. This decision does not impose a duty of mitigation upon the depositary bank nor decrease damages to the extent the depositary bank could have avoided loss through exercise of ordinary care. Indeed, courts rejecting a requirement of actual damages may merely be saying that the plaintiff need not show a causal connection between the late return of the checks and the loss (*i.e.* the depositary bank reasonably relied on the lapse of time without notice of nonpayment in allowing withdrawal of the funds). For example, the controlling Illinois Supreme Court case on liability under § 4–302, *Rock Island Auction Sales, Inc. v. Empire Packing Co.,* 32 Ill.2d 269, 204 N.E.2d

721 (1965), did not decide whether a payor bank could raise the defense of unjust enrichment in a suit brought by the depositary bank. Rather, that case held the payor bank's liability for the face amount of the check would not be offset by the amount which could have been realized if the depositary bank had exercised ordinary care. *See also Chicago Title Ins. Co.,* 1 Cal.App.4th at 809, 2 Cal.Rptr.2d 422 (the payor bank "may be held strictly liable for its failure to return the checks by the applicable deadlines, regardless of whether the [depositary bank] demonstrated it suffered actual damage solely as a result of the [payor bank's] omission").